IN THE SPECIAL EDUCATION
MATTER CONCERNING:

C.W.

A STUDENT IN THE ANCHORAGE
SCHOOL DISTRICT

To:

Sonja D. Kerr Esq.
Attorney for representative of C.W.
Disability Law Center
3330 Arctic Blvd.
Anchorage, Alaska 99503
Via fax (907) 565-1000, e mail

Jerry Sjolander
Executive Director Special Education
Anchorage School District
P. O. Box 196614
Anchorage, Alaska 99519-6614
Via fax (907) 742-4289

Ray Goad, Esq. Andrea Stone Esq.
Jermain, Dunnagan & Owens P.C.
3000 A. Street
Anchorage, Alaska 99503
Attorneys for the Anchorage School District
Via fax (907) 563-7322, e mail

Ms. Sharon Schumacher via e mail
Special Education Program Manager
State DEED
801 West 10th Street, Suite 200
Juneau, Alaska 99801-1894

Re: HR 06-02

## DECISION AND ORDER

## INTRODUCTION AND PROCEDURAL HISTORY

On July 14, 2005, the Disability Law Center (DLC) on behalf of student and his

guardian filed a request for a due process hearing with the Anchorage School District (ASD).

The allegations in the request were:

*Decision and Order DLC (CW) v. ASD 06-02 page 1*

1) that the ASD failed to provide student FAPE by failing to provide him an education designed to result in meaningful progress in this case, including but not limited to, passage of the HSGQE (hereinafter exit exam)

2) that ASD failed to provide a meaningful transition plan and

3) that ASD has failed to include Sylvan Learning Center providers in students IEP meetings therefore denying parent's full participation in the development of student's IEP. Specific remedies requested were:

1. Up to 365 hours of 1 on 1 reading services for student to be provided by Sylvan Learning Center

2. Writing and math services (presumably from Sylvan) consistent with guardian's requirement and student's need for transitional services.

3. Reimbursement to guardian of the amount he's paid for Sylvan services from 10/04/04 (reading services and costs of diagnostic assessment or reading)

4. The ASD to provide for Sylvan testing in math and writing

5. Compensatory education if appropriate.

I was appointed the hearing officer in this matter on July 24, 2005 and a pre-hearing conference was held on August 11, 2005. At the pre-hearing conference, the allegations 1-3 above were discussed but the main emphasis was placed on the HSGQE and student's scores. A hearing date of October 3-5, 2005 was originally set then continued until October 12-14, 2005 because of questions regarding the results of student's last taking of the exit exam. These hearing dates were beyond the 45 day time limit but were necessary

1) because of the parties' schedules  2) questions about student's success in the latest exit exam and 3) the fact that there was no harm to student, the potential harm being guardian's expenditures of money, for which he was seeking reimbursement.  Following the hearing, the record was held open one week for proof to be submitted re certification of Ms. Sterne

*Decision and Order DLC (CW) v. ASD 06-02 page 2*

EXHIBIT _6_
Page _2_ of _22_

and Mr. Hartlieb and parties requested an opportunity to file post hearing closing arguments after an opportunity to review the transcripts of the hearing. These briefs were originally due on or before November 14, 2005 but with agreement of the parties this time was extended. These briefs were filed on November 18th (ASD) and November 21 (DLC).

The DLC filed a pre-hearing brief on October 5, 2005 covering the issue of transition services and the possible applicability of a class action settlement agreement in Noon v. Alaska v. Alaska State Board of Education, ASD et al.Case No. 04-0057 cv (JKS).

On October 7, 2005, after the close of business, the ASD filed a Motion to Dismiss Student's and Guardian's claims on two bases:

1) any claims that arose more than one year prior to the complaint are barred by the Statute of Limitations as set forth in AS 14.30.193 (a)

2) the claims set forth in this complaint are covered under the claims set forth in Noon and are therefore barred.

Because of the lateness of ASD's motion, the opening of the hearing was continued one day, to October 13, 2005, to allow DLC on behalf of its clients to respond to ASD's dismissal motion. On October 11, 2005, DLC filed a motion for Partial Judgment on the record, which motion was withdrawn before response by the ASD and decision by me. On October 11, 2005, DLC filed its response to ASD's motion to dismiss.

The hearing commenced at 9 a.m. October 13, 2005. It was a closed hearing pursuant to guardian's request. Sonja Kerr of DLC represented the student and guardian. The guardian was present, the student was not. Raymond E. Goad Jr. and Andrena Stone of Jermain, Dunnagan and Owens P.C were present to represent the ASD as was Cindy Anderson.

The first issue addressed was the ASD's motion to dismiss. I denied the part of the motion based upon the Statue of Limitations argument for the following reasons:

1) In Mr. Owen's July 22, 2005, response of DLC's complaint of July 14, 2005, he did not

*Decision and Order DLC (CW) v. ASD 06-02 page 3*

EXHIBIT *B*
Page __3__ of __22__

raise the one year issue.

2)  The one year Statute of Limitation issue was not raised at the pre-hearing conference, the conference to set dates or to continue the hearing date one week or at any other time until Friday, October 7, 2005, after the close of business, when this hearing was to begin Tuesday, October 11, 2005.

3) While the Alaska Statue does say the S/Ls is one year, the ASD's own website says two years

3) the guardian could have amended his complaint up to five days before the hearing.  If the ASD had filed its motion five days before, I MIGHT have granted it but it was not timely.

4) 8 (c) of the Alaska Rules of Civil Procedure sets forth affirmative defenses and things that need to be pled.  ASD did not timely make its motion.

5) Last minute motions are poor practice, particularly as in this case, they were not based upon new information.

On the issue of the motion to dismiss based upon the Noon settlement, a decision on that issue was reserved for decision after the hearing.

STATUTES AND REGULATIONS CONSIDERED

20 USC Section 1415
A.S. 14.30.193
34 C.F.R. Sections 300.507,300. 503, 300.29, 300.344 (B)(3), 300.347 (a)(6)
C.F.R. Section 300.13
20 U.S.C. Section 1414 (d)(i) (A) (viii), Section 1415, Section 1401 (34), 1401 (9) (2004)
A.S.14.30.193
4 AAC 52.550 (a)
Part IV, Section 14, State of Alaska Special Education Handbook

FACTUAL BACKGROUND

Student is eighteen years old (2/1/87) at the time of this hearing and is in his second senior year at East High School of the ASD. Student entered the ASD after attending middle school and part of 10th grade in the Nenana School District.  He also attended

*Decision and Order DLC (CW) v. ASD 06-02 page 4*

EXHIBIT  _B_
Page  _4_  of  _22_

school briefly in Fairbanks and previous to this enrollment had been at East High in October of 2002, then returning to Nenana. Student had an IEP at Nenana, which IEP provided for 20 hours of Special Education per week. ASD agrees that student is entitled to special education because of a learning disability.

Student's guardian was one of student's special education instructors in Nenana (Tr. 364) and subsequently became the legal guardian of student (Tr. 362). Guardian also has a power of attorney from student authorizing him to make education decisions for student's special education issues and IEPs. (P. ex. R., p 13).

Student took his first HSGQE (High School Graduation Qualifying Exam), hereinafter exit exam, in Nenana (Tr. 368, Ex. R., p. 31) Student did not pass any portion of this exam although he was provided certain accommodations and modifications i.e.separate test setting and part of exam read to him .( P. Ex. K, p.8.)

At the time of student's reenrollment at East, his IEP from Nenana was amended to provide student .5 hours of special education per week. (p. Ex. E., p. 2, T. 372) Student's guardian testified that he was unaware of any reduction as he assumed that the .5 hours were to be be added to the hours of the Nenana IEP (Tr. 373-374) He also testified that to his knowledge no member of the IEP team had a copy of the Nenana IEP.

In the fall of 2003, student took exit exam reading and math classes through the Plato program (Tr. 271). In the fall of 2003 and spring of 2004, student again took the exit exam and failed to pass any section. (P. ex. R, ps 32-33). Student received no accommodations in these tests. (Tr. 385-6), no small group setting, no part of the exam read to him.

In the spring of 2004, guardian gave consent for student to be evaluated (P. Ex. D), ASD 6. The test ( a series of tests from the Woodcock Johnson III Tests of Achievement) was administered on Feb. 22, 2004. The summary indicated that student's performance was low average in written expression (6.4 grade equivalency), low in written language (5.1 grade equivalency) and very low in reading (3.7 grade equivalency) and on April 2, 2004

*Decision and Order DLC (CW) v. ASD 06-02 page 5*

an IEP meeting was held.( P. Ex. C) The IEP team continued to qualify student as a Learning Disabled student in the areas of Reading and written language. There was no reference to math and no tests appeared to be given in math. Student's guardian signed the IEP on April 2, 2004.

The April IEP meeting revealed that student did not have enough credits to graduate and therefore he could not be considered for a waiver of the exit exam. At the April 2004 IEP meeting, student's IEP was amended to provide 10 hours a week of special education services (P. Ex. c, p. 14, D. 7. ). The ten hours a week was broken down into 2.5 hours/week in reading (regular education teacher), 5 hours / week of study skills (special Ed teacher) and 2.5 hrs/ week (regular education teacher). Supervisory hours of the special education teacher were not broken out. There was no math goal or special education math service provided in the IEP although student had failed the math portion of the exit exam. Parent concern was described as "track for graduation, passing HSGQE and study skills help."

Post-secondary school outcomes were described on page 2 of 33 (D. ex. 7) and there is an unclear (at least to me) reference to counseling on page 5 of D's ex. 7. The baseline was not spelled out. (ex. 15, p. 18).

On May 10, 2004, student was given the right to use optional assessments when taking the exit exam i.e. calculator, clarification questions of the proctor, dictionary, thesaurus.

Student did not attend any special education summer school classes the summer of 2004 and his guardian testified that he did know that such were available, including tutoring, but did not enroll student.(Tr. 381)

In the fall of 2004, student with the assistance of his guidance counselor at East (tr. 381) began attending the King Career Center (KCC) as well as East High. Also in the fall of 2004, (September 20, 2004), student's guardian wrote a letter to Janis Dolan about student's progress or lack thereof in school. (P ex. R, ps 6-7). One of the points of concern

*Decision and Order DLC (CW) v. ASD 06-02 page 6*

was student's inability to pass the exit exam although he had taken two HSGQE courses to assist him (T. 383). Another concern was that he was having difficulty in any class that required reading and was trying to read high school texts with elementary level reading skills. (tr. 383)

As a follow up to this letter, a meeting was held on October 4, 2004 with student's guardian, Ms. Sterne, Mr. Hartlieb and Ms. Dolan in attendance. (Tr. 387) At this meeting student's guardian requested private tutoring (Tr. 389) as he did not believe that the Plato system with its emphasis on learning via computer was suitable to student's learning style. (Tr. 390). At the meeting, the guardian was told that the tutoring decision would have to be made at the secondary administration level. (Tr. 388). At the time of the meeting, student had failed all portions of the exit exam three times and student's guardian had decided that in the spring student would not take the reading portion so that he could concentrate on the others. (Tr. 91, testimony of Jan Dolan).

Student was evaluated by the Sylvan Learning Center on October 30, 2004 (Tr. 391). That evaluation showed that student's reading skills were at the 2.8 grade level in reading comprehension and 6.2 grade level in vocabulary however Nancy Anderson of Sylvan testified that student's comprehension was at the 4th grade level. The difference may have been because two separate tests were utilized. (Tr. p.    ) Student began classes at Sylvan the 2nd or 3rd week in November of 2004. (Tr. 394)

On November 10, 2004, guardian was informed by Jan Dolan that the District was not authorizing reimbursement for services from Sylvan and that an IEP meeting needed to be convened. (P. ex. R, p. 10., Tr. 389). At the December 14, 2004 meeting ASD offered to place student in the Plato class (Tr. 26) which offer was declined by guardian because he (the student) had already taken the class and there was no data to show how he had performed in the class. (Tr. 27, 30, 392) ASD also offered the "fast forward and word attack program at the meeting (Tr. 28). In addition ASD offered a special education

EXHIBIT 6
Page 7 of 22

reading class after school. (Tr. 33).

Guardian rejected all of the District's options because he believed they were not suitable for student, would interfere with his ability to get the credits required for graduation, would interfere with wrestling and work and would interfere with his KCC classes. (Tr. 393-396).

Student began attending Sylvan in the fall of 2004 and still attends Sylvan three times a week for two hours a session. (Tr. 253). There was no testimony as to how, if at all, that schedule might interfere with wrestling, work and/or KCC classes. According to Sylvan's assessment, student as of September 29, 2005, had vocabulary and reading comprehension at the seventh grade level after 176 hours of individual instruction (Tr. 254-55). Ms Anderson estimated that it would take student several more hundred hours of instruction for student to pass the exit exam. (Tr. 258)

Student took the exit exam in October 2005. Results were not available at the time of the hearing.

Guardian testified that student will continue at Sylvan until he achieves the 12th grade level in reading even if he has passed the October, 2005 exit exam. Student has chosen to continue at East High through the spring of 2006 although he will have enough credits by January, 2006.

## ISSUES PRESENTED

1. Did the settlement in Noon bar student's claim for denial of FAPE as the claim relates to
a) the exit exam
b) the transition plan

2. Has Schaffer v Weast, 2005 Westlaw 3028015 (11/14/05) changed the burden of proof in this due process hearing?

3. Did the ASD deny student FAPE by failing to provide him an education designed to

*Decision and Order DLC (CW) v. ASD 06-02 page 8*

EXHIBIT *B*
Page *8* of *22*

result in meaningful progress, including but not limited to passage of the HSGQE (exit exam)?

4. Did the ASD fail to provide FAPE if it did not invite Sylvan Learning Center providers to IEP meetings?

5. Did the ASD provide a meaningful transition plan for student?

## PERSONS TESTIFYING

1. Cindy Anderson, Director of Secondary Special Education Services for ASD

2. Jan Dolan, Special Education Chair, East High School, ASD

3. Kim Sterne -Special Education teacher, ASD

4. Greg Hartlieb, Special education teacher and vocational counselor, East High, ASD

5. Eudora Frazcek - Director of State and Federal Compliance for the Special Education Division, ASD

6. Dr. Barbara Bateman - consultant in special education and special education law

7. Nancy Anderson – Director of Education, Sylvan Learning Center

8. Jeff Mayrand - guardian of student

9. Dr. Mary De Houx, school psychologist at East High School

10. Sam Spinella, Assistant principal for curriculum, East High

## DISCUSSION AND FINDINGS OF FACT

1) Did the settlement in Noon bar student's claim for denial of FAPE as the claim relates to :

a) the exit exam

b) transition services

The Settlement Agreement states in paragraph IX

a) IX Releases

A Releases by the class

this paragraph of the release clause does not apply to

*Decision and Order DLC (CW) v. ASD 06-02 page 9*

EXHIBIT _β_

page _9_ of _22_

"(2)any and all issues of instructional validity, curricular validity and opportunity to learn material tested by the HSGQE. " These claims are not released and as the claims in this case relate specifically to the opportunity to learn material tested by the exit exam,

A. I FIND THAT CW'S CLAIM IS NOT BARRED.

b) Noon does not cover any claims relating to the provision of transitional services therefore

B. I FIND THAT THIS PART OF CW'S CLAIM IN NOT BARRED.

2) Has Schaffer v. Weast, 2005 Westlaw 3028015 (11/14/05) changed the burden of proof in this hearing?

No. This case arose in a jurisdiction which had no statutory or regulatory authority speaking to which party has the burden of proof in a due process hearing. Alaska does in 4 AAC 52.550(a) which states that the school district bears the burden of proof in a due process hearing as to "all facts and circumstances" therefore

C. I FIND THAT SCHAFFER V. WEAST DOES NOT APPLY TO THIS PROCEEDING AND THEREFORE THE BURDEN REMAINS WITH THE ASD.

3) Did the ASD deny student FAPE by failing to provide him an education designed to result in meaningful progress, including but not limited to passage of the HSGQE (exit exam)?

It is clear from the original request for hearing, the testimony received at the hearing and the pleadings filed that the basis of guardian's and student's claim against the ASD that FAPE was denied to student was the fact that student had continuously from his sophomore year in Nenana to the spring of 2005 as a first year senior at East failed the HSGQE (exit exam).

While the IDEA requires that a child with disabilities be provided with access to a FAPE, it does not require a guarantee of a particular outcome. One of the principal cases on this issue is Board of Education of Northport East Northport Union Free School District v. Ambach, 436 N.Y.S. 2nd 564 (N.Y. Sup. Ct. 1981).

*Decision and Order DLC (CW) v. ASD 06-02 page 10*

Ambach is particularly on point here because the issue was - did denial of their high school diplomas because of their failure to pass an exit exam deny them FAPE. The court said no as did the 7th Circuit in 1983 in deciding Brookhart v. Illinois State board of Education, 607 F. 2d 1796.

While the ASD has been far from perfect in providing student FAPE

1) by failing to provide progress reports to guardian (Ms. Sterne said she did but had no documentation) although her testimony about frequent communication with guardian(Tr. 231, 287, 306) was corroborated by guardian (Tr. p. 415) and he believes that she was committed to Chris and his education. (Tr p. 416) She also testified as to how she measured his progress (Tr. 211, 12, 214) and guardian acknowledged that he received student's drag sheets (Tr. 425-426), grade reports (Tr. 425), was kept informed by Ms. Sterne and believed student made progress in the 03-04 school year. (Tr. 419)

2) by not spelling out with specificity in student's IEP how student's hours of special education were allocated between the regular education teacher and special education teacher

3) by not spelling out again in the IEP the amount of supervision the special ed teacher provided to the regular teacher, which is required by the Alaska State Education handbook. This latter issue is a continuing problem in due process cases which needs to be addressed by ASD.

However it seems apparent that the main obstacle to student's passage of the exit exam has been the failure of student to avail himself of the opportunities which ASD offered him to assist in passage of the exam.

For example:

1) student was offered the opportunity, specifically at the 12/2004 IEP meeting to participate in a special education reading class which would provide him direct instruction in

*Decision and Order DLC (CW) v. ASD 06-02 page 11*

EXHIBIT B
Page 11 of 22

the area of reading. It would be taught by a special education teacher and would be located at East High. It would have 12-15 students, one teacher and one TA. It would not be computer based. (Tr. 33-34) This offer was rejected because student does not like to be in special education classes. (Tr. Cindy Anderson p. 25) guardian (Tr. 415) He has a social group at school and was not going to be in a special education class. (Tr. 304.310)

2) Student was offered the opportunity to attend an after school study skills class taught by a special education teacher, which would put a focus on reading and working on HSGQE and study skill issues (Tr. p. 26) This class would have six students and would provide for individualized instruction. (Tr. p. 32) This was rejected because student was in wrestling so the offer was made for him to attend after wresting (Tr. p. 26) However it should be noted that student was injured during wrestling so would have had time for this class. (Tr. p. 303)(Tr. p. 25)

3. Student was offered the opportunity to take another HSGQE preparation class (Plato). This was rejected because student had previously taken this course. There was no data produced by ASD to show his performance in the class or what could be done to make it better for student (Tr. p. 29, 30). Ex. R, P. 3 shows however that in fact having taken the reading course prior to any Sylvan instruction, student increased his score by 22 points. Mr. Spinella also testified that the HSGQE courses are generally effective although some students need to take them more than once. (Tr. ps. 465-468). In addition, students are initially assessed, then get their assignments based upon their needs so that Plato is individualized for them. (Tr. 475)

4. Student was also offered a fast forward class, verbally only, which is remedial reading not specifically for special education. Again this is a computer based class which has helped students with phonetic awareness. (Tr. p. 27). This was rejected because student wouldn't be willing to attend. (Tr. p. 25, 415)

5. Student was offered but did not utilize accommodations in the fall 2004 exam, Ex. A, p.

*Decision and Order DLC (CW) v. ASD 06-02 page 12*

2, Ex. C, p. 6, Ex. 8. He would have been entitled to small group testing, had the ability to ask clarifying questions, then after December IEP, use a thesaurus and a calculator. (Tr. 37, 38). Student felt it was cheating and he wanted to take the exam without them (Tr. p. 40, 296, 297,410)).His guardian, Ms. Sterne and Ms. Dolan were to talk to him about utilizing these (Tr. p. 40, 41) Kim Sterne, student's special education teacher testified that asking clarifying questions would have helped student (Tr. 298,299). She was his proctor in several of his exams. However the school psychologist at East, Dr. De Houx testified that she was never asked to counsel student about utilizing accommodations. (Tr. 438)

6. Student was offered but did not utilize the opportunity of a credit recovery program (Tr. p. 44). It was not however ever put into an IEP that the guardian could review, accept or reject (Tr. p. 47) because it was rejected by guardian as being too difficult for student. (Tr. p. 45)

7. Ms. Sterne offered to give student a 7th hour 1 on 1 study skills instruction (Tr. p. 224) This was not accepted. Student did not wish to stay for the 7th hour. (Tr. p. 225) Student also according to Ms. Sterne (Tr. 344) would never have sat down and allowed her to give him an entire practice test.

Ms. Sterne provided individualized reading comprehension services to student, particularly in the context of his history class material (Tr. 258,259). She also provided student with reading instruction in her study skills class and has observed him doing private reading at school. (Tr. 300). She observed that his personal reading was of a very high level (Tr. p. 206) so she conducted a Slosson oral reading test on student which reflected a 5th grade reading level. She felt he definitely made progress in the 2004-05 school year (Tr. p. 221, 223) as did his guardian. Ms. Sterne also taught student test taking techniques (Tr. 294) and the use of test accommodations. (Tr. 295, 296)

D  I FIND THAT STUDENT IS ENTITLED TO SPECIAL EDUCATION SERVICES AS A RESULT OF HIS LEARNING DISABILITY.

*Decision and Order DLC (CW) v. ASD 06-02 page 13*

EXHIBIT _B_
Page _13_ of _22_

**E. I FIND THAT THE ASD PROVIDED STUDENT WITH THE OPPORTUNITY FOR FAPE AND THAT STUDENT FAILED TO UTILIZE THE OPPORTUNITIES OFFERED BY ASD BEFORE SEEKING SERVICES ELSEWHERE.**

There was an issue raised during the hearing as to whether Ms. Sterne and Mr. Hartlieb had valid Alaska certificates to teach as their names did not appear on the State rolls. Ms. Sterne was carried under her maiden name and Mr. Hartlieb's name was misspelled. (Ex.s 17a and 17b) I am satisfied and

**F. I FIND THAT MS. STERNE AND MR HARTLIEB HAVE VALID ALASKA LICENSES AND DID DURING THE TIME THAT THEY TAUGHT/COUNSELED STUDENT.**

**4. Did the ASD fail to provide FAPE if it did not invite Sylvan Learning Center providers to IEP meetings?**

Both sides agree that Sylvan representatives did not attend any of student's IEP or other meetings after they began offering services to student. Ms. Sterne believed that it was the guardian's responsibility to invite Sylvan representatives and was unaware of the fact that she could or should invite them. Guardian testified that he didn't believe that anyone from Sylvan even attended any meetings and that he couldn't recall whether anyone from the ASD ever asked him about student's Sylvan program (Tr. p. 400). Nancy Anderson of Sylvan testified that no one from Sylvan had been invited to IEP meetings and if they had, they would have attended. (Tr. 259)

There are significant differences between the Shapiro case, 317 F. 3rd 1072 (9th Cir. 2003) cited by guardian and this case. In Shapiro, the SD notified the parents of an IEP meeting. Parents requested a postponement. The District denied the postponement because of staff scheduling. In addition the district did not include a representative from the student's private school, which the student was exclusively attending, unlike this case. The

*Decision and Order DLC (CW) v. ASD 06-02 page 14*

EXHIBIT _6_
Page _14_ of _22_

court held there were significant procedural flaws and found that the procedural violations denied FAPE. IDEA requires the persons most knowledgeable about the child attend the IEP meetings. There is no question of the fact that Ms. Sterne as student's special education teacher is knowledgeable about student and has had a great deal of interaction with student. See paragraph nos. 5 and 7 supra. There is also no doubt that in this case, the parent participated in the IEP meetings. Ms. Sterne together with Mr. Mayrand had first hand knowledge of the student's needs.

Procedural flaws in and of themselves do not constitute a violation of FAPE. It is violations that result in the loss of an education opportunity or seriously infringe upon the parent's (guardian's) opportunity to participate in the IEP process. W.G. v. Board of Trustees of Target Range SD No. 23, 960 F. 2d 1479, 1484 (9th Cir. 1991). DiBuo by DiBuo v. Bd of Education of Worcester County 37 IDELR 271 (4th Cir. 2002).

Shapiro held that the private placement gave student an appropriate education reasonably calculated to provide the student with educational benefit. Here the student/guardian rejected proposals from ASD that not only were likely to provide educational benefit but also likely to increase the probability that student would pass the exit exam. The refusal to accept any of the district's proposals made it difficult for the SD to provide the services/result guardian was seeking. The ASD did provide guardian with a explanation as to why the proposal of Sylvan was not accepted when it stated that they were options available at the Anchorage School district that had not been utilized that would address student's reading goals .(Ex. 9) Also

all suggestions for alternatives were rejected before any trial of them, with the exception of Plato classes which student taken twice. (Dec. 2004 IEP)

The guardian's opportunity to meaningfully participate in the IEP process was not hampered. In Adam J. v. Keller Independent School District, 39 IDELR 1 (US Ct. of Appeals, 5th Cir. 2003) the IEP lacked goals and objectives and the parents were not

*Decision and Order DLC (CW) v. ASD 06-02 page 15*

notified of progress (not the case here as to notification). The student did make progress affording an education benefit and therefore there was no loss of education opportunity. True here. (See Ex. 3)

In Bend-Lapine School Dist v. DW, 152 F. 3rd 923 (9th Cir. 1998), 28 IDLER 734, the court specifically looked at the student's resistance to special education as precluding full implementation of his IEP and therefore the school did not deny FAPE. There is no doubt that in this case, student was resistant to special education or additional classes. See Finding of Fact E above and paragraphs no. 1,2,5,6,and 7.  Therefore

## G. I FIND THAT FAILURE TO INVITE SYLVAN REPRESENTATIVES TO IEP MEETINGS DID NOT CONSTITUTE A DENIAL OF FAPE.

5.  Did the ASD provide a meaningful transition plan for student?

Student is 18 years old (2/1/87) and is in his second senior year at East High School. Student as of the time of the hearing had insufficient credits to graduate and had not as yet passed the HSGQE. He is still eligible for special education and related services because he has not graduated with a regular high school diploma and he has not reached the age of 22 (applicable in this circumstance).

Under the terms of the IDEA , school districts are required to provide students with disabilities transition services.  In fact, beginning no later than the first IEP after students reach 16, the IEP must include appropriate measurable post-secondary goals and transition services.  20 U.S.C. Section 1414 (a)(1) (14)(i)(viii) (ac-dd) provides that training, education, employment and independent living skills as appropriate need to be included.

Student was 16 as of the 2002-2003 school year before the implementation of the 2004 IDEA amendments but within the previous requirements of IDEA that required that transition services be addressed for eligible students of 14 years of age.

*Decision and Order DLC (CW) v. ASD 06-02 page 16*

At the September 2003 IEP meeting, student's guardian was not provided with any written information about transition services nor was anything re transition included in student's IEP (Tr. 373). Guardian expressed ignorance of transition services until he sought advice from the DLC. (Tr. 375). There was no formal transition evaluation done for student but Mr. Hartlieb discussed post-secondary plans with student and invited student to come to a meeting on types of assessments of which the interest survey (Career Decision Maker) was one. Student did not attend. (Tr. 146-47). Mr. Hartlieb assisted student with the paperwork for the KCC and talked with him about Navy service possibilities. All of this was done informally and without participation of guardian as Mr Hartlieb was unaware of guardian's power of attorney. (Tr. 150-51, 139, 141, 148). Mr. Hartlieb has continued to work with KCC personnel (Tr. 139-143) to make sure that student is progressing. Mr. Hartlieb.

As student was never formally evaluated for transition services, his actual needs were never determined. (Tr. 64).

The transition services and appropriate measurable post-secondary goals are to be included with student's IEP. To the date of the hearing, his IEP contained no measurable goals. (P. Ex. C, K ) although Greg Hartlieb, the vocational coordinator for East High school attended the 12/2004 IEP meeting., he according to his testimony (Tr. p. 158) did not provide any data or documentation to the IEP team re student's skills for transition. He was aware that student had failed the HSGQE and taken the ASFAB, although the only source of results for that exam was the student. Mr. Hartlieb also knows that student would need to have a diploma to get into the Navy. (Tr. p 162)

In Ex. 7, p. 4 of the April 2004 IEP there is a section on desired post-school outcomes. and present levels of performance. The source of the information was the student. It states that he is not sure where to get post-secondary training ie. college, military job corps, vo-tech, OJT etc/. In the Statement of Needed transitions (Ex. 7, p. 5) it stated increase his attendance, study skills support and behavior contract for org? There is no

*Decision and Order DLC (CW) v. ASD 06-02 page 17*

explanation of the last entry but student had had some behavior, anger issues that appeared to resolve before the beginning of the next school year. In ex. 11, the IEP of March, 2005 it describes post school outcomes as plans to go into the Navy and become a cook. The possibility of college and the U. of Las Vegas (assume mean U. of Nevada at Las Vegas). Behavior was no longer a concern. There was no mention of an evaluation to see whether or not any of these goals were feasible for student.

Dr. Barbara Bateman, guardian's expert, gave an outline of what transition evaluation and services are available to school districts. Among them are Transition Planning Inventory, Life Centered Career Education and Assess for Success (Tr. 180) She defined transition services as a "coordinated set of activities that school and the family and the student plan, s sometimes with other community agencies or with an agency like vocational rehabilitation." (Tr. 177). The purpose is to prepare student for life after school. (Tr. 179).

She strongly recommended (Tr. 184-85) that the parent be involved and as referenced above, student's guardian never participated in or was informed of a transition evaluation. Dr. Bateman did state that as yet the phrase age appropriate transition assessment has not as yet been developed in regulation or by hearing officers. Tr. 180-183). Dr. Bateman did state that the assessments could be informal ibut should always include the parent and should not be based upon just one interview. (Tr. 184-85).

20 USC Section 1401 and 34 C.F.R. 300.29 define transition services as a results oriented process that focuses on helping the student move from school to "life", my phrase, whether it be post-secondary education, vocational education, continuing and adult education, integrated employment, adult services, independent living or community participation.

The individual student's needs, interests, preferences and strengths are taken into account and are to be considered in determining "appropriate, measurable post-secondary goals."

*Decision and Order DLC (CW) v. ASD 06-02 page 18*

EXHIBIT _B_
Page _18_ of _22_

The Alaska Special Education Handbook IV, Section 14 speaks to transition matters and states that "transition planning is an integral component of the IEP" and it explicitly i includes agency representatives as recommended members of the IEP team for transition planning service. DVR, for example, was never included. Mr. Hartlieb testified that representatives of DVR would come to the school and he would invite students to an orientation meeting, as he planned to do for student this spring (2006). (Tr. 153-54).As he originally believed student would graduate first semester of 2005-06, the question is raised why would he not have invited DVR representatives to the spring 2004 meeting, the December 2004 meeting or the March 2005 meeting? In particular at the December 2004 meeting when guardian spoke about Sylvan and the fact that student was taking reading classes there and the ASD had refused to pay for Sylvan because student had not utilizied the opportunities available through the ASD; why did Mr. Hartlieb as his vocational counselor, who was aware of his problems with reading and math which would impact his ability to get into the Navy, not invite a representative from DVR to attend to see what assistance they might provide?

An IEP that only records Student's existing interests but doesn't reflect any active transition planning on the part of the District other than interest inventory as given by Mr. Hartlieb is not adequate. How is student going to achieve his goals? What assistance either through District programs or other available community or State programs can be provided to student? What future instruction needs does student have. What was written in his IEP transition plan that reflected his unique needs because of his learning disability or was what was stated something that would be given to any student? What addressed his known weaknesses in reading and his presumed weakness in math because of his failure to pass the math portion of the exit exam?

The ASD has argued that guardian never indicated any problem with transition services to the IEP team, Ms. Sterne, etc. so that therefore the concern emanates from his

*Decision and Order DLC (CW) v. ASD 06-02 page 19*

EXHIBIT β
Page 19 of 22

lawyers and should not be considered by me. That the parent and student need to be involved in the transition process goes without saying but the the responsibility to explore and determine the needs of the student in preparation for post secondary training is the school districts. Federal law puts responsibilities on the Districts and so does Alaska. See also Thornton Fractional Township High School District #128 Illinois State Education Agency, 002189, January 16, 2002.

Student's latest IEP transition plan does not reflect student's known deficiencies in reading and math, which will impact his ability to function in his post-high school environment.

**H. I FIND THAT ASD DID NOT APPROPRIATELY EVALUATE STUDENT FOR HIS TRANSITION FROM HIGH SCHOOL TO POST-SCHOOL LIFE AND THAT THE FAILURE TO PROVIDE STUDENT A TRANSITION PLAN MEETING THE REQUIREMENTS OF THE IDEA AND ALASKA STATE HANDBOOK IS A DENIAL OF FAPE.**

The guardian also raised in his request for a due process hearing relief that would provide writing and math services to student , presumably from Sylvan, consistent with transition services needs. He also requested that student's math and writing proficiency be tested by Sylvan.

As to the testing of student's math and writing proficiency, the ASD has test mechanisms other than the exit exam of assess student's math and writing proficiency and my order will cover that. The ASD presumably can also provide student additional writing and math services if he is willing to accept them.

## CONCLUSIONS

1. Student is a child with disabilities who is eligible for special education and related services.

2. The ASD has an obligation under the IDEA to make special education services available to student.

*Decision and Order DLC (CW) v. ASD 06-02 page 20*

EXHIBIT _6_
Page_20_ of _22_

3. The term "free appropriate public education" (FAPE) is defined as special education and related services that are provided at public expense, that meet the standards of the State and are provided in conformity with an individualized education program (IEP)

3. The requirement of a FAPE is two fold:

a) have the procedures set for in the IDEA been adequately complied with?

b) is the IEP reasonably calculated to enable the child to receive education benefits?

4. The findings of fact on pages 10 through 16 of this decision show that the obligations of of the ASD as to student were met by the District's offers of services to student and therefore there is no violation on the part of the ASD as to those issues.
Student was provided a FAPE.

5. The ASD has a further obligation under the 2004 IDEA, Section 614(d)(1)(A)(i)(VIII)(aa-dd) to provide transition services and appropriate measurable post-secondary related goals to students who have reached he age of 16. These goals are to be updated annually. ASD has not developed the required goals as outlined on pages 16 though 20. Therefore Student was denied a FAPE as to the transition portion of the student's claim.

ORDER

Based upon the foregoing Findings of Fact and Conclusions of Law it is hereby ordered as follows:

1. C.W's claim for Sylvan tutoring expenses from November 2004 to the present is denied.

1. A IEP team meeting shall be convened within 30 days of the date of this order. The team shall consider transition planning for the student and will either write a new IEP or amend the existing IEP to provide for the measurable goals as required by IDEA 2004.

2. To accomplish this it is contemplated ASD will conduct testing of student in the areas of reading, writing and math to determine how deficiencies in these areas if any will need to be

*Decision and Order DLC (CW) v. ASD 06-02 page 21*

addressed in the transition plan. In addition a more formal assessment of student's interests and aptitudes needs to be done.

3. The issue of compensatory education is reserved pending the findings of the IEP team .

Based upon the proceeding Findings of Fact and Conclusions of Law, The Anchorage School District has prevailed on the preponderance of issues in this case but guardian and student have prevailed as to the issue of transition services. This is a final decision.  If either party wishes to appeal this decision, they may proceed in the state superior court under As. 44.62.560 and Alaska Appellate Rule 602 (a)(2) which provides for thirty days from receipt of this decision to appeal or to the federal district court under its rules and regulations which provide for a 90 day appeal timeframe.

Dated this 13th day of December, 2005.

Sheila Gallagher
Hearing Officer

EXHIBIT _b_
Page____22_of _22_

*Decision and Order DLC (CW) v. ASD 06-02 page 22*