JDO
Jnd 925
NOV 21 2005

STATE OF ALASKA
DEPARTMENT OF EDUCATION AND EARLY DEVELOPMENT
SPECIAL EDUCATION DUE PROCESS HEARING
BEFORE SHEILA GALLAGHER, HEARING OFFICER

In the Special Education Matter Concerning C.W.

vs.

Anchorage School Dist.

DEED CASE No. 06-02

Student's Written Closing Argument

## INTRODUCTION

Transition services are key to provision of a free appropriate program of education for a high school student with disabilities. As one IHO in Alaska has already ruled, transition services must include a coordinated set of activities starting with a transition evaluation of the student to determine the student's transition needs and taking into account the student's preferences and interests and must include measurable goals related to same. See *C.S. v. A.S.D.*, DEED Dec. No. 05-13 (holding under IDEA 2004 "beginning not later than the first IEP to be in effect when a student is 16, and updated annually thereafter, the IEP must include appropriate measurable post-secondary goals and transition services.").

According to the Federal Department of Education, Office of Special Education Program regulations concerning the IDEA, transition, and diplomas, the rule applicable to this case is rather simple:

> "Graduation with a regular high school diploma ends a student's eligibility for Part B services, and is, therefore, a change in placement. Exiting or graduating a student with a disability with a credential that is different from the diploma granted to students who do not have disabilities does not end an individual's eligibility for Part B services, and is not a change in placement requiring notice

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000



EXHIBIT L
Page 1 of 6

Before starting Sylvan, C.W. made no progress with respect to his reading skills. An IEP dated April 2004 states his reading level at 3.7 grade level. Since attending Sylvan, C.W.'s reading has increased from approximately a 4th grade level to a 6th grade level. P. Ex. S, D. Ex. 1. The testimony is clear that only Sylvan staff was working on the phonetic skills C.W. needed to improve his basic reading. ASD staff was focused primarily on reading comprehension and helping C.W. read his schoolwork.

There was a complete lack of objective evidence from ASD that C.W. had made progress with respect to the goals on his IEP or the HSGQE. C.W.'s HSGQE scores prior to starting Sylvan were as follows:

| Test Administration Date | Reading | Writing | Math |
|---|---|---|---|
| Nenana 10th grade | 219/ Proficient is 322 | 242/ Proficient is 275 | 252/ Proficient is 328 |
| East 11th grade fall | 263/ Proficient is 322 | 238/ Proficient is 275 | 291/ Proficient is 328 |
| East 11th grade spring | 285/ Proficient is 322 | 268/ Proficient is 275 | 285/ Proficient is 328 |
| East 12th grade fall | Not taken | 239/ Proficient is 275 | 306/ Proficient is 328 |

See P. Ex. R, pgs. 31-34. Each score C.W. received on the HSGQE before attending Sylvan is significantly below the proficient level.

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000





C.W. has taken the HSGQE twice since he began receiving services from Sylvan, which he began in November 2004. The first administration of the exit exam was in the spring of 2005, less than 6 months after he began at Sylvan. P. Ex. R, pg. 35. The most recent administration of the exit exam was in October 2005, but those results were not available at the time of the hearing.

Substantial and uncontroverted evidence was presented at hearing that C.W. is making progress in his reading skills as a result of the assistance from Sylvan. . Ms. Anderson, Director of Education for Sylvan explained C.W.'s progress in reading through a series of assessments conducted while C.W. has been receiving services from Sylvan. P. Ex. S; D. Ex. 1. Ms. Anderson testified that when C.W. was first evaluated by Sylvan his **reading comprehension was at a 4th grade level**, and in **vocabulary he started instruction at the 6th grade level.** PFF 51. Ms. Anderson testified that C.W. was given several diagnostic tests to determine his level of skill, such as the Grays Oral Reading Test and the California Achievement Test among others. PFF 54; D. Ex. 1, pg. 3. The California Achievement Test showed that C.W.'s reading comprehension was just at a 2.8 grade level. D. Ex. 1, pg. 1. Ms. Anderson further indicated that C.W. was given a standardized assessment before he was determined to have mastered a skill for a particular grade level. PFF 55.

Ms. Anderson testified that as of September 29, 2005 C.W. was working on vocabulary and reading comprehension at the 7th grade level after 176 hours of individual instruction, an increase of three grade levels in approximately 11 months time. PFF 55.

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000





In stark contrast, C.W. had not made any reading progress according the evaluations used by the district. The Nenana IEP showed C.W. reading at a 3.7 grade level according to the Woodcock Johnson administered in 2001. ASD's testing in February of 2004, before C.W. began at Sylvan, demonstrated that C.W.'s reading skills remained deplorably low at with C.W.'s broad reading at 3.7 grade level, broad written language at 5.1 grade level and C.W.'s written expression at 6.4 grade level. P. Ex. D, pg. 1, P. Ex. K.

Only after attending Sylvan has C.W. been able to raise his scores. The ASD is responsible for the costs of Sylvan, a total of $17,384.59.00.

## III. MR. MAYRAND WAS NOT GIVEN THE OPPORTUNITY TO MEANINGFULLY PARTICIPATE IN THE IEP PROCESS

The essential premise and purpose of the IDEA is that parents of children with disabilities are to be informed and equal partners in the development and management of their child's program of education. *Mills v. Board of Education of the Dist. of Columbia*, 348 F.Supp. 866 (D.C. 1972). The basic structure developed in *Mills* of "prior written notice" to ensure parents were equal partners was later codified into the IDEA. See 20 U.S.C. § 1415(b)(3), (4), 1414(b)(1); 34 C.F.R. 300.503. The IDEA drafters envisioned a process in which parents knowledge about their child's needs would be joined with school staff knowledge about educational services would be utilized in a cooperative fashion to determine special education eligibility, development of and review and change of individual programs created to meet the unique needs of each disabled child. In 1985, the United States Supreme Court reiterated the importance of this <u>joint</u> participation process in *Burlington Sch. Comm. v. Dept. of Ed.*, 471 U.S. 359 (1985):

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000



EXHIBIT L
Page 4 of 6

With regard to present levels of performance contained in C.W.'s IEPs from East High School, the IEPs do not accurately identify C.W.'s low reading level and related learning problems. Further, there is no indication of C.W.'s struggles with math. The District provided a vague statement of performance. C.W.'s IEPs from 2003-2004 and 2004-2005 also call for measurement of the goals on a quarterly basis. P. Ex. C. The ASD did not put forth any evidence of these quarterly reports. PFF 20, 53. Specifically, each IEP since C.W. has been attending East High School has been deficient in the area of present levels of performance.

September 2003 IEP Amendment

The September 2003 IEP Amendment does not contain any present levels of educational performance. P. Ex. E. The IEP Amendment reads that the team accepted the Nenana IEP with the changes indicated in this amendment. P. Ex. E, pg. 1. However, the Nenana IEP was based on an eligibility report done in 2001. P. Ex. K, pg. 1. Therefore, any information the IEP team had at the time the IEP Amendment was put into place was at least 2 years old. Further, it is suspect whether or not the team even had the Nenana IEP at the time the IEP amendment was developed. The IEP amendment reduces C.W.'s special education service by 19.5 hours. P. Ex. K, pg. 10; P. Ex. E, pg. 2. Clearly the district failed to take into consideration C.W.'s present level of performance from the Nenana IEP as C.W. was a 10th grader reading at a 4th grade level, which would obviously impact his ability to participate in the general education curriculum.

April 2004 IEP

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000





Dated this 18th day of November, 2005.

Sonja D. Kerr, #0405091

Meg K. Allison, #NA11799
Disability Law Center

Certificate of Service

I hereby certify that on the 18th day of November 2005, a true and correct copy of this document was served by courier:

Bradley Owens/Ray Goad
Jermain Dunnagan & Owens, PC
3000 A Street, Suite 300
Anchorage, AK 99503

Meg Allison

DISABILITY LAW CENTER OF ALASKA
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
907-565-1002
1-800-478-1234 Fax 907-565-1000