Case 3:06-cv-00009-TMB   Document 26-13   Filed 08/16/2006   Page 1 of 8

State of Education Case No. 0602                                Due Process Hearing for C.W.

Page 235

1

2  State of Education Case No. 0602

3

4

5

6              Anchorage School District

7              Due Process Hearing for C.W.

8

9                         COPY

10

11              October 14, 2005

12

13              Disability Law Center

    3330 Arctic Boulevard

14              Suite 103

    Anchorage, Alaska 99503

15

16

    Commencing at 8:30 a.m.

17

18  Volume II - Pages 235 - 502, inclusive

19

20

21

22                                        EXHIBIT N

23                                        Page 1 of 8

24  Reported by:  Susan J. Warnick, RPR

25

Case 3:06-cv-00009-TMB   Document 26-13   Filed 08/16/2006   Page 2 of 8

State of Education Case No. 0602                                    Due Process Hearing for C.W.

Page 428

1  HEARING OFFICER: Well, how about a quick recess
2  before we start her.
3      (Recess taken.)
4  HEARING OFFICER: Your witness, Mr. Goad. And
5  we need to swear -- would you swear in the witness,
6  please.
7      (Witness sworn.)
8          MARY DEHOUX
9          EXAMINATION
10 BY MR. GOAD:
11 Q  Dr. DeHoux, where are you employed?
12 A  Anchorage School District.
13 Q  How long have you been there?
14 A  This is my seventeenth year.
15 Q  What position do you hold?
16 A  I'm the school psychologist at East.
17 Q  And where are you located -- oh, at East?
18 HEARING OFFICER: Excuse me. Could we back up
19 and would you state your full name and spell it for
20 record.
21 THE WITNESS: Yes. Yes. My first name is Mary.
22 My last name is DeHoux, D-e-H-o-u-x.
23 HEARING OFFICER: Okay. Sorry.
24 MR. GOAD: No problem.
25 BY MR. GOAD:

Page 429

1  Q  What are your job duties as a school psychologist at
2  East?
3  A  I'm involved in lots of different things. I do
4  assessments, I do consultation with teachers, I do
5  classroom observations of kids with special education
6  services. I do crisis intervention. I do some
7  consultation with kids or teachers when they're worried
8  about suicide or depression, that kind of stuff.
9  Q  Would you describe your educational background,
10 please.
11 A  Yes. I went to undergraduate school at Moorhead
12 State University in Minnesota. And got my master's degree
13 in school psychology there. I got my undergraduate in
14 elementary education and psychology. I got my master's in
15 school psychology. Then I went and got my Ph.D. at the
16 University of Iowa.
17 Q  What was your Ph.D. in?
18 A  School psychology with an emphasis in pediatric
19 psychology.
20 Q  Do you hold any teaching certificates?
21 A  Well, I used to. I had my teaching certificate for
22 elementary education in Minnesota and Iowa and then I
23 dropped it at this last recertification.
24 Q  Are you nationally board certified?
25 A  I am.

Page 430

1  Q  In what?
2  A  In school psychology.
3  Q  As part of your job as a school psychologist, do you
4  administer tests of cognitive ability?
5  A  Yes.
6  Q  Such as the Wexler?
7  A  Yes.
8  Q  Do you also interpret scores from exams such as the
9  Wexler?
10 A  Yes.
11 Q  Is it part of your job to administer achievement
12 tests?
13 A  Yes, that's the main part of my job.
14 Q  Do you also interpret scores from achievement tests?
15 A  Yes.
16 Q  Are you familiar with -- let me turn your attention
17 to this booklet.
18 A  Okay.
19 Q  Exhibit 6. It's tabbed at the end. Page seven. Are
20 you familiar with District's Exhibit 6?
21 A  Sure. Exhibit 6, page seven?
22 Q  That's correct.
23 A  Okay. Okay.
24 Q  Looking at the Wexler scale, what, if anything, do
25 those scores tell you about the cognitive ability of the

Page 431

1  test taker?
2  A  Well, first of all, his performance IQ, or the
3  nonverbal test of intelligence, is 102, which is solidly
4  within the average range. The average range is
5  approximately 90 to 110. His verbal IQ is just slightly
6  below the average range. When those two scores are added
7  together, his full scale is 93, which is solidly within
8  the average range. He's a smart young man.
9  Q  Have you heard of the Gray Oral Reading test?
10 A  I've heard of it, yes.
11 Q  And is it an achievement test?
12 A  It's a test of oral reading. It's an oral reading
13 test.
14 Q  Is it a standardized instrument?
15 A  Yes, it is.
16 Q  What does "standardized" mean?
17 A  "Standardized" means it's based on probably of
18 thousands of kids that have taken the test. And they get
19 the norms about what kids should know at each age level
20 and -- across the country and getting different
21 percentages according to the national population and then
22 developing norms and percentile ranks and those kinds of
23 things for the test.
24 Q  And what, if anything, does standardization mean
25 about the validity of GORT results for a test taker?

EXHIBIT N
Page 2 of 8

Case 3:06-cv-00009-TMB    Document 26-13    Filed 08/16/2006    Page 3 of 8

State of Education Case No. 0602                                Due Process Hearing for C.W.

Page 432

1  A   Well, standardization helps prove the test validity
2  because you've tested kids across the nation at all kinds
3  of different age levels. Does that answer --
4  Q   Yes. And then let me turn your attention to Exhibit
5  1, page one.
6  A   Okay.
7  Q   On the left-hand side of the page, about halfway
8  down, there's indication of reading rate, TRP book nine.
9  A   Yes.
10 Q   Do you recognize this evaluation instrument?
11 A   No, I don't.
12 Q   Assume that it's a test instrument that's designed by
13 Sylvan --
14 A   Okay.
15 Q   -- and is not standardized.
16 A   Okay.
17 Q   Would you prefer to give a standardized test
18 instrument or a nonstandardized test instrument to test
19 reading achievement?
20     MS. KERR: Objection. I'm going to object to
21 this entire line of questioning as I do not see any
22 relevance. We did not hear anything prior to the hearing
23 that results of Sylvan were in question. We have no
24 report from this individual, we have no written
25 recommendations of this individual, and I think it's

Page 433

1  highly prejudicial. And I also don't understand quite the
2  relevance of it since I don't think there's any dispute
3  about the scores. I also don't think there's any
4  foundation.
5      HEARING OFFICER: Well, I agree with part of
6  what you said, but not all. I think that the questions
7  regarding the type of tests and the test score with which
8  you are familiar, they are relevant in general. If you
9  can -- because I think, if I remember correctly, that
10 Nancy Anderson testified that she didn't understand norms.
11 She didn't know anything about that.
12     MR. GOAD: And that the TRP wasn't a
13 standardized --
14     HEARING OFFICER: Was not a standardized test.
15 So I think, as long as the testimony is about what are
16 standardized tests and whether or not we can take these
17 results at face value, then I think that's relevant.
18 BY MR. GOAD:
19 Q   So to restate my question: Would you prefer to give
20 a standardized test instrument or a nonstandardized test
21 instrument to test reading achievement?
22 A   To test reading achievement, a standardized test
23 would be a lot better.
24     MS. KERR: Sorry. I couldn't quite hear that.
25     THE WITNESS: I said, a standardized would be

Page 434

1  better to be testing reading achievement. It depends on
2  what you're using the information for.
3  BY MR. GOAD:
4  Q   And then just above that there's the oral reading
5  test, the GORT. Have you ever administered any version of
6  the GORT?
7  A   In graduate school I administered the GORT, the first
8  edition of it. We actually have the GORT IV at East and
9  I've administered it, but I've never done the III,
10 although when you look through the -- it's very similar to
11 the IV; they've just updated the norms.
12 Q   Given your background and experience, are you able to
13 discern anything about the reading achievement of the test
14 taker from the GORT scores on Exhibit 1?
15 A   Well, it would -- certainly, when you're looking at
16 this his scores are -- in terms of rate and accuracy --
17 are very poor, significantly below average; whereas his
18 comprehension is below average, it's slightly higher.
19 Q   Are you familiar with the HSGQE -- the exit exam?
20 A   Yes.
21     MS. KERR: Objection. Foundation. "I'm
22 familiar" doesn't tell me anything. The whole state of
23 Alaska is familiar with it from the newspaper.
24     HEARING OFFICER: What do you know about the
25 exit exam?

Page 435

1      MR. GOAD: That was going to be my next
2  question.
3      HEARING OFFICER: And how?
4      THE WITNESS: I know a lot about the test.
5  Certainly we look at -- I'm not -- I mean, I know tons
6  about it. What specific parts?
7  BY MR. GOAD:
8  Q   Well, if you could describe -- first describe for me,
9  what areas does the exit exam test?
10 A   It tests reading, writing and math.
11 Q   And how does it test reading?
12 A   It's a variety of things. Kids generally have to
13 read a passage and then answer comprehension questions
14 regarding that passage.
15 Q   And how does it test the writing?
16 A   The writing is very different. Certainly the kids
17 have to write, you know, like an essay on -- given a
18 certain topic, but then there's also questions about
19 composition: For example, would this sentence fit in the
20 beginning of the paragraph or the middle of the paragraph
21 or which sentence doesn't belong in the paragraph? So
22 it's not just writing; it's also what goes into the
23 composition of writing assignments.
24 Q   Is the GORT at all similar to the HSGQE?
25 A   In many ways it is, in terms of the comprehension.

Case 3:06-cv-00009-TMB    Document 26-13    Filed 08/16/2006    Page 4 of 8

State of Education Case No. 0602                                                Due Process Hearing for C.W.

Page 436

1  The kids have to read a -- in the GORT, the kids read a
2  passage aloud and then they have five comprehension
3  questions following that.
4  Q   What, if any, difficulties might a student with an
5  average or above average IQ and a reading disability have
6  with the reading portion of the exit exam?
7  A   Well, at times, if the --
8         MS. KERR: I'm going to object as speculative.
9  There's no -- still no foundation. There's no explanation
10 of the basis of the person's knowledge. There's no
11 testimony she's given it, researched it, anything.
12        HEARING OFFICER: Do you deal with the exit exam
13 at East in your professional duties at East?
14        THE WITNESS: Well, this is my first year at
15 East, but last year I was at Bartlett.
16        HEARING OFFICER: With the Anchorage School
17 District?
18        THE WITNESS: Sure. I helped administer in a
19 small classroom that was giving it to special education
20 students. I helped -- whatever the accommodations were.
21 I was sort of the backup person for those special
22 education teachers and -- in giving the reading portion of
23 the HSGQE.
24        HEARING OFFICER: You don't have anything to do
25 with scoring of the test?

Page 437

1         THE WITNESS: No.
2         HEARING OFFICER: That's all an outside agency?
3         THE WITNESS: Yes.
4         HEARING OFFICER: Do you ever get any of the
5  exam results back for an individual student? I know that
6  in general --
7         THE WITNESS: Right. And I try to at least
8  include the results -- like when I'm doing a three-year
9  evaluation, I'll usually put in a sentence about which
10 parts the kid has out of or passed, or which sections he
11 needs to continue to pass. And then, you know, in
12 conversation with the kids, I'll sometimes show them their
13 results, although they've already seen them: This was
14 your passing score; this is what you got.
15        HEARING OFFICER: Do you ever analyze the exams
16 with the specific idea of what the student could do to
17 improve his score?
18        THE WITNESS: You know, I certainly know that
19 that data is available, but usually my job more is -- you
20 know, I'm not a special educational teacher and that's
21 their realm, is figuring out, you know, which actual
22 sections does the student need in order to pass it. I
23 certainly know how to look at that information, but I'm
24 usually in there to find out if the kid continues to
25 qualify for special ed and then move on from there.

Page 438

1         HEARING OFFICER: Do you ever do anything with
2  the psychological component of the test, if the student
3  has failed several times and yet seems to have the
4  ability?
5         THE WITNESS: Right. I get called in lots for
6  test anxiety kinds of things, relaxation exercises,
7  test-taking strategies. It's doing a number on our kids.
8         HEARING OFFICER: Sorry. Would you like to
9  proceed? I've sidetracked your line of questioning.
10        MR. GOAD: That's fine.
11 BY MR. GOAD:
12 Q   I believe that my question was: What, if any,
13 difficulties might a student with an average range IQ and
14 a reading disability have with the reading portion of the
15 exit exam?
16 A   Well, they might have trouble with the directions.
17 When kids are brighter, they have betters chance of
18 picking up contextual clues and words within the passage
19 that they understand and kind of fit pieces together, that
20 kind of thing.
21        But if you can't read or understand the
22 directions on what you're supposed to do in different
23 situations, it would make the test harder to take, for all
24 of us.
25 Q   And what, if any, difficulties might a student with

Page 439

1  an average or above average language IQ and a reading
2  disability have with the writing portion of the exit exam?
3  A   The writing would almost, in some sense of the word,
4  be harder because there the kids -- the tasks are so
5  different. They have to know what the authors want them
6  to write about, so they have to be able to read that
7  introductory organizer. And then the other -- the
8  sentence structure of the questions are fairly difficult
9  at times.
10 Q   Do you know what test accommodations are?
11 A   Sure.
12 Q   What are they?
13 A   Test accommodations are those things that we can do
14 for special a education student or a 504 student to make
15 the testing more appropriate: Smaller class size,
16 unlimited time, those kinds of things.
17 Q   Is there a state Department of Education-approved
18 menu of accommodations for the exit exam?
19 A   Yes, there is.
20 Q   Would a student who had the scores in Exhibit 6 and
21 Exhibit 1 be a student for whom accommodations are
22 recommended?
23 A   Yes.
24        HEARING OFFICER: Can't accommodations only go
25 so far? If a student doesn't have the basic reading

Case 3:06-cv-00009-TMB   Document 26-13   Filed 08/16/2006   Page 5 of 8

State of Education Case No. 0602                                  Due Process Hearing for C.W.

Page 440

1 background, is there any way to accommodate them into
2 passing the test?
3     THE WITNESS: Well, at times then we can -- and
4 this is part of my job, but we can apply to the state to
5 get modifications which even further break down the task.
6 But then you need, you know, state approval to do that.
7     The accommodations, you know, sometimes can
8 involve clarifying test directions, that kind of thing,
9 that would certainly be helpful to kids.
10     HEARING OFFICER: So an accommodation could be
11 to clarify?
12     THE WITNESS: I think that's one of the list. I
13 didn't bring it. I certainly know that's a very possible
14 modification.
15     HEARING OFFICER: Well, we've had testimony that
16 a student could ask the proctor or someone to interpret or
17 to assist --
18     THE WITNESS: In clarifying the directions, yes.
19     HEARING OFFICER: Yes, not telling them the
20 answer, but in clarifying --
21     THE WITNESS: Because one of the modifications a
22 kid can have is using a dictionary or a thesaurus or those
23 kinds of things, but that needs to be approved by the
24 state.
25     HEARING OFFICER: Right. But that can also be

Page 441

1 an accommodation as well, can't it, to use a dictionary?
2     THE WITNESS: I would have to check my list.
3     MR. GOAD: I don't have anything further.
4     HEARING OFFICER: Ms. Kerr?
5     MS. KERR: Yes.
6          EXAMINATION
7 BY MS. KERR:
8 Q  Can you just tell me how to pronounce your name
9 again?
10 A  DeHoux.
11 Q  DeHoux.
12 A  It's French.
13 Q  French. Okay. Ms. DeHoux, I'm Ms. Kerr. I'm
14 working with the family.
15     You've never conducted any evaluation of the
16 student in question here, Chris Wright, correct?
17 A  Correct.
18 Q  And you've never specifically reviewed any of his
19 IEPs, correct?
20 A  Yes, I have reviewed them.
21 Q  Has anyone from his IEP team ever asked you to review
22 his IEPs?
23 A  Prior to this hearing?
24 Q  Yes.
25 A  No. I'm brand-new at East, so there's only --

Page 442

1 Q  When did you first review anything about Chris
2 Wright?
3 A  Well, it's only October, so I would think within the
4 last month.
5 Q  You've never attended any IEP meeting for him?
6 A  No.
7 Q  With respect to the test of -- the Gray Oral Reading
8 test, you said that that test is used by Anchorage,
9 correct?
10 A  No, it's not one of the traditional tests that we
11 give.
12 Q  It isn't? You said you had it available. I thought
13 I heard you say --
14 A  Right. At times -- we have a whole set of test kits
15 that English -- or reading teachers, those kinds of
16 teachers, can use in their classroom to get more
17 information about how the student reads in terms of, you
18 know, diagnostics and remediation.
19 Q  So I'm confused then. Either Anchorage does use the
20 GORT or doesn't use the GORT.
21 A  School psychologists don't use it generally as part
22 of the regular evaluation system. It's an additional test
23 that we don't traditionally use.
24 Q  So it's not a test that a psychologist gives, but it
25 is a test that the Anchorage School District special

Page 443

1 education teachers are allowed to give?
2 A  I would think so, yeah. I don't think there's a law
3 against it, by any means.
4 Q  Do you know of any reason why -- well, strike that.
5     Are you familiar with the Woodcock Johnson?
6 A  Yes, I am.
7 Q  Would you agree with me the Woodcock Johnson is a
8 standardized test of achievement?
9 A  Yes.
10 Q  Have you seen Chris Wright's Woodstock Johnson that
11 was performed by Anchorage in February of 2004?
12 A  Yes.
13 Q  Would you look at Exhibit 5, please. Exhibit 5, page
14 two is a summary and a score report entitled a compu-score
15 version of the Woodcock Johnson that was administered to
16 Chris Wright in February of 2004.
17     Do you see that?
18 A  Uh-huh.
19 Q  Yes?
20 A  Yes.
21 Q  You have to say yes or no.
22 A  I'm sorry. That's right.
23 Q  Under the -- toward the bottom it says, "nor the
24 following achievement test was administered." Do you see
25 that?

Case 3:06-cv-00009-TMB   Document 26-13   Filed 08/16/2006   Page 6 of 8

State of Education Case No. 0602                              Due Process Hearing for C.W.

Page 444

1  A  Yes.
2  Q  Are you familiar with the fact that these items
3  listed there, the "letter," "word," "reading fluency,"
4  "spelling" and so forth, are subtests of the Woodcock
5  Johnson?
6  A  Yes.
7  Q  And you're familiar as well that those -- the
8  subtests listed there are not the entirety of the subtests
9  of the Woodcock Johnson?
10 A  Yes.
11 Q  In fact, there are many more subtests of the Woodcock
12 Johnson than are listed there, correct?
13 A  Yes.
14 Q  One of the ones not listed is word attack; is that
15 correct?
16 A  Well, letter/word identification gets to that same
17 skill. But, yes, word attack is not listed and I do
18 believe it's one of the subtests.
19 Q  And word attack is generally never performed as a
20 subtest by the Anchorage public schools; isn't that
21 correct?
22 A  Yes.
23 Q  And word attack specifically and intentionally
24 evaluates a student's phonetic skills, correct?
25 A  As does the letter/word identification.

Page 445

1  Q  Letter/word identifies -- it's your testimony that,
2  if we pulled the manual for the Woodcock Johnson, it would
3  say that letter/word is equivalent to testing word attack;
4  is that your testimony?
5  A  My testimony is you're absolutely correct that we
6  don't traditionally give the word attack subtest. I'm
7  telling you that you can also get some information about
8  how the kids decodes words by looking at the letter/word
9  identification. I'm not sure what the manual says.
10 Q  Would you agree or disagree that those word attack
11 skills are those used to determine pronunciation of a word
12 through structural analysis or phonics and, in order to
13 assess the word attack or the skills of a student, an
14 examiner would normally need to read a word to the student
15 to identify the consonants, vowels, et cetera.
16    Does that sound correct to you --
17 A  Yes.
18 Q  -- as an explanation of "word attack"?
19 A  Yes.
20 Q  Is it your understanding, and would you agree, that
21 students must be able to decode words before they can gain
22 meaning from the printed page?
23 A  Most of the time most of us can read and understand
24 more words than we necessarily can pronounce.
25 Q  Okay. But my question isn't whether you can

Page 446

1  pronounce them. My question is decoding.
2     Is it your testimony decoding you intellectually
3  would teach a student to read from simply memorizing the
4  words as opposed to sounding them out, utilizing phonetic
5  structure?
6  A  I'm still not sure --
7  Q  Have you ever taught a student to read, ma'am?
8  A  Yes.
9  Q  Is it your intention generally, when you teach a
10 student to read, to use programs that are based on sight
11 word reading versus decoding words?
12 A  Actually, the best research suggests that you use
13 both strategies.
14 Q  And so if you at the School District do not generally
15 give a word attack test to specifically determine the
16 phonetic skills of a student, you wouldn't be able to
17 teach to the phonetic needs of a student; would you?
18 A  Possibly.
19 Q  Now, with respect to these achievement test subtests
20 of the Woodcock Johnson, would you agree with me that the
21 broad reading score at the top, that references grade
22 equivalency 3.7, is a combination; is it not, of
23 letter/word and reading fluency and passage comprehension?
24 A  Correct.
25 Q  And if that is the case, then are we primarily

Page 447

1  measuring, with that 3.7 score, passage comprehension and
2  reading fluency and letter/word versus phonetic skill? In
3  other words, the grade equivalent of 3.7 would generally
4  be measuring more reading comprehension than it would word
5  attack; would it not?
6  A  You know, I don't know statistically how they came up
7  to weigh each one of those factors, but it certainly
8  measures -- it's an overall measure of reading score --
9  Q  Well, what if you wanted to get a specific score on a
10 child's basic reading skills? Would you generally utilize
11 the Woodcock Johnson broad reading or would you utilize
12 Woodcock Johnson basic reading?
13 A  What's the question?
14 Q  You're familiar with the Woodcock Johnson test of
15 achievement, correct?
16 A  Yes, I am.
17 Q  Are you familiar with a test called Woodcock Johnson
18 reading mastery, ma'am?
19 A  Yes, I am.
20 Q  And you agree with me that the Woodcock Johnson
21 reading mastery would be a specific test designed to
22 elicit all the specific details a your child would have
23 with reading, right?
24 A  Yes.
25 Q  That would be the most specific standardized test for

Case 3:06-cv-00009-TMB    Document 26-13    Filed 08/16/2006    Page 7 of 8

State of Education Case No. 0602                                    Due Process Hearing for C.W.

Page 448

1  a reading problem, right?
2  A  Yes.
3  Q  Does Anchorage School District have that test?
4  A  Probably.
5  Q  Does Anchorage School District administer that test
6  at East, that you know of?
7  A  Not that I know of.
8  Q  Have you ever administered it?
9  A  Yes.
10      MR. GOAD: Objection. Relevance. There's been
11  no --
12      MS. KERR: She raised it.
13      MR. GOAD: There's been no claim that there's
14  been insufficient testing.
15      MS. KERR: It's been raised by them, not us.
16  They opened the door.
17      HEARING OFFICER: Yeah, you did.
18      But I'm also interested in hearing what these
19  differences are, so go ahead.
20  BY MS. KERR:
21  Q  With respect to the Woodcock Johnson III test of
22  achievement, you would agree with me that there is also,
23  on the Woodcock Johnson test of achievement, a broad math
24  score, correct, that can be obtained?
25  A  You can get a broad math score, yes.

Page 449

1  Q  And that measures a child's ability to calculate as
2  well as a child's mathematical reasoning?
3  A  Yes.
4  Q  Do you know of any reason why it would be appropriate
5  for a student with a learning -- with potential learning
6  disabilities to not attempt to find out the child's math
7  skills?
8      HEARING OFFICER: Go ahead.
9      THE WITNESS: When a child is learning disabled
10  in the areas of reading and writing, we would give a
11  follow-up test in reading and writing unless someone had
12  told us that they were now concerned about their math.
13  We're only obligated to give the tests in the areas --
14  reevaluations. Certainly if this was an initial
15  evaluation, I would have given the math section.
16  BY MS. KERR:
17  Q  What if it was an initial evaluation in the Anchorage
18  School District, ma'am? Would you have included math?
19  A  I would have probably given that whole battery, yes.
20  Q  Including math?
21  A  Yes.
22  Q  And the reason would be to make sure that you knew
23  exactly what the child's math skills were?
24  A  Right.
25  Q  Do you know, as a school psychologist, if a student

Page 450

1  is being evaluated for the first time for eligibility
2  purposes for the Anchorage School District, is it typical
3  or atypical to give the child one test, in other words,
4  the Woodcock Johnson, and that's it, as an achievement
5  test?
6  A  Yes, that's standard.
7  Q  So you give only one achievement test when you
8  initially evaluate students?
9  A  If we get the information that we need, yes, we would
10  stop at the one.
11  Q  Is it your understanding -- do you have working
12  knowledge, ma'am, of the IDEA?
13  A  Yes.
14  Q  Is it your understanding -- your professional
15  understanding under the IDEA, that it is acceptable for
16  you to base eligibility determinations on the use of one
17  test?
18      MR. GOAD: Objection. That calls for --
19      HEARING OFFICER: That's sustained, yes.
20      MS. KERR: Well, I was asking her her working
21  knowledge because his dad testified about him not being
22  able to get services in math.
23  BY MS. KERR:
24  Q  Let me ask you this --
25  A  I don't remember that.

Page 451

1  Q  -- is it your understanding that, if a student
2  qualifies for services in special education in any area,
3  that the child can receive any services that the child
4  needs, such as a child who's qualified in reading and
5  writing who needs assistance in math?
6  A  Well, at times, if we are giving a child a study
7  skills class, they're going to get services in what areas
8  they need as well as math assistance, if they bring it
9  forward as, you know, an area of concern.
10  Q  What if a student has failed the math portion of the
11  HSGQE like six times? Would that indicate a need, to you,
12  in math?
13      MR. GOAD: Objection. It assumes facts not in
14  evidence. I don't know that there's been six total
15  failures.
16      MS. KERR: Well, I'm happy to have her review
17  them.
18      MR. GOAD: Well, at the time of the ESER (ph),
19  which is what I think you're -- you're going for, I mean,
20  I just don't recall that there's --
21      MS. KERR: Well, let's assume that the student
22  had previously qualified for services in math.
23      HEARING OFFICER: I think we're getting beyond
24  the scope of this.
25      MS. KERR: Well, they raised it.

Case 3:06-cv-00009-TMB   Document 26-13   Filed 08/16/2006   Page 8 of 8

State of Education Case No. 0602                                Due Process Hearing for C.W.

Page 452

1  HEARING OFFICER: No. No, I think you have gone
2  from a crack to a great, big, wide --
3  MS. KERR: I think it's kind of a canyon myself.
4  HEARING OFFICER: Yeah, well, okay. But you've
5  made the canyon too wide at the top. And now I think that
6  we've gone beyond the scope of what this hearing is
7  actually about.
8  MS. KERR: Then I guess we'll have to file an
9  additional hearing on math.
10  HEARING OFFICER: If you want to.
11  MS. KERR: Okay. We will. I just think we
12  should -- I just should indicate for the Hearing Officer
13  that, in our original request for hearing, we indicated
14  that Mr. Mayrand arranged for testing for Chris in math
15  and writing at Sylvan.
16  HEARING OFFICER: What exhibit is that?
17  MS. KERR: It's in my letter --
18  HEARING OFFICER: The January 3rd letter or the
19  July --
20  MR. GOAD: What exhibit?
21  MS. KERR: Exhibit 12.
22  It says we haven't been able to afford Sylvan
23  services in all those areas, but we did notify the school
24  that we were asking Sylvan to test in all areas.
25  HEARING OFFICER: Okay. I see it. Page two.

Page 453

1  MS. KERR: Okay.
2  BY MS. KERR:
3  Q  Are you familiar with a test called the Slosson?
4  A  Yes, familiar with it.
5  Q  Have you ever given it?
6  A  In graduate school.
7  Q  So your familiarity with the Slosson test is about
8  the same as your familiarity with the GORT or you have
9  more familiarity with the GORT?
10  A  I have more recent familiarity with the GORT.
11  Q  With respect to the Slosson, is that a standardized
12  test?
13  A  Yes, if I remember right.
14  Q  Yes?
15  A  Yes.
16  Q  And is it your understanding that administration of a
17  standardized test to an individual student requires a
18  notice of evaluation, in special education?
19  A  It depends on what the purpose of the test is going
20  to be for. Teachers -- special education teachers do get
21  a chance to give different things. Whenever they're --
22  they can give diagnostic tests to find out information
23  that they'll use in order to teach the child to read,
24  which is covered under teaching principles.
25  Q  Would it be your recommendation that it's consistent

Page 454

1  with the practice of the Anchorage School District for a
2  teacher to conduct a Slosson and not notify the parent
3  ahead of time?
4  A  I'm not sure how to answer that, because I know
5  teachers use different tests in their classroom and, as
6  part of instruction, it's perfectly acceptable that you
7  would. Certainly --
8  Q  You would do it without telling a parent?
9  A  If it's for diagnostic purposes, in terms of how I'm
10  going to teach the child to read tomorrow, I think it's
11  okay. It's in the child's best interests.
12  Q  You said that knew a lot about the HSGQE. Would you
13  please tell me any specific training you've taken on the
14  HSGQE?
15  A  I've given -- I've taken the proctor training. I've
16  taken the training that's been given by -- oh, what's
17  Laurel Vorachik's (ph) new title? -- in testing and
18  evaluation.
19  Q  Is that someone within the District?
20  A  Yes.
21  Q  And when was that?
22  A  Oh, it was last year sometime.
23  Q  Are you aware that a student with a disability can
24  request an accommodation or a modification that this
25  student have the entire HSGQE read to them?

Page 455

1  A  I believe that's a modification that needs to have
2  state approval first, yes.
3  Q  And whose responsibility, in terms of an IEP team
4  function, would it be to raise that issue of a
5  modification request to the state?
6  A  I'm not usually involved in that part. I would think
7  it would be a team decision.
8  Q  If a student has repeatedly failed the HSGQE, all
9  portions, six times, wouldn't you agree it would be
10  reasonable that the School District request a modification
11  to the state that this student have the opportunity to
12  have the entire test read to the student?
13  MR. GOAD: Objection. Calls for speculation.
14  MS. KERR: So was most of her other testimony.
15  HEARING OFFICER: Go ahead.
16  THE WITNESS: I would think that would be pretty
17  drastic. Hopefully, the -- there's other accommodations
18  that will have been tried first, but it's certainly an
19  option.
20  BY MS. KERR:
21  Q  You've specifically provided counseling to students;
22  is that your testimony?
23  A  I do provide some counseling, yes.
24  Q  Have you ever been asked to provide counseling to
25  Chris Wright?