Case 3:06-cv-00009-TMB   Document 27-6   Filed 08/18/2006   Page 1 of 3

State of Education Case No. 0620                         Due Process Hearing for C.W.

```
                                                              Page 1
 1
 2
 3   State of Education Case No. 0602
 4
 5
 6
 7            Anchorage School District
 8            Due Process Hearing for C.W.
 9
10                                              COPY
11
12            October 13, 2005
13
14            Disability Law Center
              3330 Arctic Boulevard
15                Suite 103
              Anchorage, Alaska 99503
16
17
              Commencing at 9:00 a.m.
18
19   Volume I - Pages 1 - 234, inclusive
20
21
22                                         EXHIBIT G
23                                         Page 1 of 3
24
25   Reported by:  Susan J. Warnick, RPR
```

Case 3:06-cv-00009-TMB   Document 27-6   Filed 08/18/2006   Page 2 of 3

State of Education Case No. 0620                                    Due Process Hearing for C.W.

Page 170

1  high school for high school purposes.
2  Q  Have you ever asked?
3  A  No.
4  Q  With respect to giving permission to take the
5  interest inventory, it's your testimony that you didn't
6  try to obtain permission to evaluate Chris utilizing an
7  interest inventory because you --
8  A  I don't believe --
9  Q  -- an evaluation?
10 A  -- I said that.
11 Q  I thought what you said you generally get permission
12 to evaluate when you gave an interest inventory.
13 A  If that is summarizing my question, I think my
14 question would be: Do you generally obtain parental
15 permission to administer an interest inventory?
16 Q  Okay. So to follow up on that question, you said, no
17 to that, you said you don't usually get parental
18 permission?
19 A  That is correct.
20 Q  So then you never sought parental permission to
21 obtain any -- to conduct any type of transition evaluation
22 for Chris?
23 A  From the parent, you mean?
24 Q  Yes.
25 A  That is correct, yes.

Page 171

1        MS. KERR: I don't have anything else. Thank
2  you very much.
3        Is Ms. Sterne around?
4        MR. GOAD: Probably not. I can give her a call.
5  We can do Eudora, if you'd like. We can put her on the
6  phone. I need to run to the rest room. We will make the
7  call for Kim right now.
8        HEARING OFFICER: Off record.
9        (Off record.)
10       HEARING OFFICER: So would you swear the
11 witness. Eudora, are you still there?
12       THE WITNESS: Yes.
13       (Witness sworn.)
14          EUDORA FRAZCEK
15          EXAMINATION
16 BY MS. KERR:
17 Q  Eudora, this is Sonja.
18 A  Hi.
19 Q  How you doing?
20 A  All right.
21 Q  I just have a few quick questions for you.
22    First of all, can you just state your position
23 with the District?
24 A  I'm director of the state and federal compliance for
25 Special Education Division.

Page 172

1  Q  What does that mean?
2  A  I have several sections to my job. With regard to
3  federal compliance, I assist the directors of the
4  individual departments, that would be related services,
5  secondary special education, and elementary special
6  education, to comply with due process and to prepare for
7  due process hearings. I assist their administrators with
8  mediations in situations where there is a parent and a
9  district disagreement. And with regard to the state
10 compliance piece, I work specifically when we have a state
11 complaint that has been filed or I assist with auditing
12 that's being completed at the state level.
13 Q  And are you familiar with what the practice of the
14 District is with respect to providing records when they
15 are requested by a parent or DLC?
16 A  To some extent.
17 Q  Do you know or were you involved with any request for
18 release of records with regard to Chris Wright?
19 A  If there was a records request filed after June of
20 this year, then I would most probably have been involved.
21 Q  We have a copy of the request for hearing here,
22 Eudora, which is July 14, 2005.
23 A  Uh-huh.
24 Q  And in that -- it was not sent to you, but --
25 A  Can you --

Page 173

1  Q  We can hold on.
2  A  I'm sorry.
3  Q  Are you okay?
4  A  Yeah. I just couldn't hear what you were saying.
5  Would you go back to the beginning of the question?
6  Q  Sure. With respect to Chris Wright, the request for
7  hearing is dated July 14, 2005. It's Exhibit 12 here, and
8  it was sent to Mr. Sholander and to Cindy Anderson. In
9  that, we made a request. We indicated, please find an
10 updated release so you can communicate with us and share
11 any additional records beyond those forwarded in response
12 to our letter of May 4, 2004.
13       And I'm wondering if you have any knowledge
14 about whether the District responded to that request for
15 additional records?
16 A  I do not have personal knowledge. I would have to
17 check my records, which are not in front of me.
18 Q  Would that have been your responsibility or someone
19 else's?
20 A  It would primarily be my responsibility.
21 Q  Would that -- when a request is made for all records,
22 would that normally include all quarterly progress
23 reports?
24 A  It includes whatever we have in the special education
25 main file, which is generally where progress reports are

Case 3:06-cv-00009-TMB   Document 27-6   Filed 08/18/2006   Page 3 of 3

State of Education Case No. 0620                                    Due Process Hearing for C.W.

Page 174

1  supposed to be sent, yes.
2      I'm sorry -- I'm trying to....
3  Q  That's okay. If we received -- we did not receive
4  any additional records from you in terms of quarterly
5  progress reports, can we assume that they are none?
6      MR. GOAD: Objection, calls for speculation.
7      MS. KERR: Well, I'm just asking. She's the
8  person that is in charge --
9      HEARING OFFICER: Custodian of the records, so
10 what is normally in the main special educational file,
11 which is what she referred to.
12     MR. GOAD: I'm not certain in testifying to her
13 background that she said she was custodian of records for
14 Anchorage School District, but.
15     HEARING OFFICER: I thought that she responded
16 that after the end of June this year that she would be
17 responsible, if not responding to the request at least
18 assisting or --
19     MS. KERR: Overseeing the request. That's what
20 I heard.
21     HEARING OFFICER: After the end of June.
22 BY MS. KERR:
23 Q  Ms. Frazcek, I'm just asking: If we received no
24 quarterly progress reports, can we assume there were no
25 quarterly progress reports in the special education file

Page 175

1  that you were referring to, the main file?
2  A  I would get my special education records from the
3  main file and from the department chairman at the high
4  school, as well as usually the registrars at the high
5  school, because they would hold the file.
6  Q  So if in response to our request we received no
7  quarterly progress reports, does that mean there are none?
8  A  That means that the places I would have looked, I
9  didn't find them.
10     MS. KERR: That's all I have. Thank you.
11     MR. GOAD: I don't have anything.
12     HEARING OFFICER: Okay. Thanks a lot.
13 Appreciate it.
14     THE WITNESS: Did Ray say no questions?
15     MR. GOAD: I'm have no questions.
16     HEARING OFFICER: You're done.
17     THE WITNESS: Okay.
18     HEARING OFFICER: Thank you. Good-bye.
19     MS. KERR: I think, is Ms. Sterne here yet?
20     MR. GOAD: I don't know.
21     MS. KERR: Because otherwise I think we could
22 put Barbara Bateman on quickly.
23     MR. GOAD: Is what you want me to do or do you
24 want me to check?
25     MS. KERR: Go ahead. Why don't you call and see

Page 176

1  if you can still catch Barbara.
2      HEARING OFFICER: We are off record.
3      (Off record.)
4      MS. KERR: Hi, Dr. Bateman. You're joining this
5  hearing in progress, and I appreciate your availability.
6  I think the court reporter will need to swear you in.
7      THE WITNESS: All right.
8      (Witness sworn.)
9           DR. BARBARA BATEMAN
10          EXAMINATION
11 BY MS. KERR:
12 Q  Dr. Bateman, what is your occupation?
13 A  I'm a consultant in special education and special
14 education law.
15 Q  And what are your academic credentials?
16 A  Bachelor's degree is in psychology, my master's is in
17 special education; Ph.D. in special education, and a J.D.
18 in law.
19 Q  And, Dr. Bateman, do you have a knowledge in working
20 with school districts in various areas of special
21 education, including working and teaching teachers about
22 special education?
23 A  Yes indeed.
24 Q  And we have submitted a portion of an excerpt from a
25 book that I believe you have written called Better IDEAs?

Page 177

1  A  Yeah.
2  Q  And the topic within that that we excerpted is on
3  transition services. I just want to ask a few clarifying
4  questions about transition services. Okay?
5  A  Yes.
6  Q  First of all, can you just tell us generally, what
7  are transition services?
8  A  Transition services are a coordinated set of
9  activities that schools and the family and the student
10 plan, sometimes with other community agencies or with an
11 agency like vocational rehabilitation, and the purpose of
12 these coordinated activities is to help the student adjust
13 successfully to life after school outside of school.
14     And one of the problems that we've had in
15 special ed for many years in the past was that students
16 who finished their special education often were not
17 employed at the level that they could have been, should
18 have been, too often did get further vocational or other
19 post-secondary training.
20     So these activities are designed to take a
21 student from where they are, typically sophomore or junior
22 year in high school, through these planned coordinated
23 activities in the areas of employment, community contacts,
24 post-secondary education, if that is appropriate;
25 independent living for some students, so that when they